CASE 18.—ACTION BY H. L. SMITH'S ADMINISTRATOR
·AGAINST THE NORTH JELLICO COAL COMPANY
FOR CAUSING THE DEATH OF PLAINTIFF'S IN-
TESTATE.—December 18.

## Smith's Admr. v. North Jellico Coal Co.

Appeal from Knox Circuit Court.

H. C. FAULKNER, Circuit Judge.

Verdict for defendant. Plaintiff appeals.—Af-
firmed.

1. Master and Servant—Master's Liability for Injuries—Mines—
Negligence.—Plaintiffs' decedent was employed in a coal mine
by defendant to undercut coal. After he had undercut a
quantity of coal, other men dislodged it by explosives, and
still others shoveled it away, and cleared up the room, pulling
down any loose or overhanging slate, and carrying it out.
After performing their duty the day decedent was injured,
the shovelers reported to decedent that the place was safe,
and, on return to work, he was injured by falling slate from
the roof. The roof of the mine was bad, having a large crack
in it through which water percolated into the mine. If the
place appeared to be dangerous, it was decedent's duty to
order in props to strengthen the roof and prevent the slate
from falling down. On this occasion decedent made no at-
tempt to strengthen the roof, although the cutting out of a
block of coal always increased the danger. Held. that the
defendant was not liable for causing decedent's death, as it
is not the duty of a master to furnish a servant with a safe
place in which to work where the work which the servant
is doing constantly makes the place where he is working
dangerous.

2. Words and Phrases—"Gin Men."—"Gin men" are men em-
ployed in coal mines who have no specific work to do, but
are hired to do general work, or any kind of work they are

ordered to do. The word is probably a contraction of the word "general."

Judge Nunn, dissenting.

J. A. SCOTT and W. C. MARSHALL for appellant.

JAS D. BLACK and B. B. GOLDEN for appellee.

(No briefs—Record out of office.)

OPINION OF THE COURT BY JUDGE BARKER—Affirming.

H. L. Smith, the decedent of the appellant, was engaged in operating a coal-cutting machine in the coal mines of appellee in Knox county, Kentucky. At the time of the accident which caused his death, he was engaged in what is called "turning a room" from one of the main entries. The passageway which he was cutting was about 10 feet wide, and was to extend some little distance from the main entry before the room was turned. Smith had cut in some eight or ten feet, and the coal had been taken out. The top of the mine was of slate, and had a hill seam running across it. At best the top was bad, being what the miners term a "rotten top," and the hill seam, which was a large crack through which water percolated into the mine, made it still worse. Smith's business was simply to undercut the coal with a machine which was operated by compressed air, and then there were men, called "shovelers" and 'shooters," whose business it was to come in and bore holes in the face of the coal which was loaded with powder, and the coal so undercut was blown down by the explosion of the powder, after which the shovelers would remove it by loading it into cars by which it was transported to the mouth of the mine and onto a tipple. It was also the duty

of these shovelers and shooters to pull down any loose, overhanging slate, and to carry it out of the room so that it would be out of the way. It was their duty to observe whether the slate was about to fall, or in danger of falling, and this they did by tapping it with picks and shovels, judging by the sound as to whether there was any immediate danger of its falling. If there was, it was their duty to pull down the slate so as to prevent its falling on the miner operating the machine. The evidence shows, however, that there was always danger of slate falling after the coal was removed for any considerable space, and it appears that, in order to make the roof of a mine safe when the coal is removed, it is necessary at short distances to prop the roof with logs or props cut for and adjusted to that purpose. There were other men in attendance or employment who are called "gin men," which word seems to be a contraction of the word "general," and means men who have no special employment in the mines, but who do general work, such as bringing in props, or doing any other thing which they are ordered to do. One of the duties of the gin men was to bring in props whenever in the opinion of the miner it was necessary for safety to prop the roof of the mine where the operation was going forward. Just before the decedent went into the room where he met with the accident which caused his death, the shooters and shovelers cleaned it up and made such investigation as led them to believe that it was safe, and they informed the decedent that they were ready for him to cut. He went in with his machine, and, after cutting there some little time, a large piece of slate which had become loosened fell upon him, and so crushed him as to cause his death in a few weeks thereafter. To recover damages for this accident this action was insti-

tuted; the petition alleging that the master was negligent in failing to furnish him with a safe place in which to work. The answer placed in issue the material allegations of the petition and pleaded the case, after plaintiff's evidence was all in, the trial court awarded the defendant a peremptory instruction to the jury to find for it; and to test the correctness of this ruling this appeal is prosecuted.

There is no doubt that the evidence shows the roof of the room where the decedent was working was bad, and its natural danger was enhanced by the existence of the hill seam running across it. This condition was known to all the employes, being perfectly obvious to the eye. The evidence for plaintiff shows that, while it was the duty of the shooters to pull down loose slate and carry it out, after all, it was the duty of the decedent to judge of the safety of his surroundings himself. The very work that he was doing made the room dangerous unless it was propped, and it was his duty, whenever he needed or thought he needed props, to call for them, and the gin men were required to bring them in and put them up. The evidence shows that after the coal is taken out for any considerable space the room becomes dangerous. And this must necessarily be so. The enormous pressure of the mountain from above has a tendency to crush in the top of the mine after the coal which had formerly supported it has been removed, and, when the coal was removed for any considerable space, ordinary care for his own safety required the decedent to have the room propped. This he failed to do in time to prevent the injury which occurred to him. The situation in which the decedent was placed constitutes an exception to the general rule that the master must furnish the servant with a safe place in which to work.

The danger of the place in which he was working was made or created by the very work which the servant was doing. Every time he cut out a block of coal he increased the danger of the roof falling in, unless it was propped as before explained. The decedent did not call for props, and, when he had taken out sufficient coal to cause the pressure from above to break the slate so that it fell upon him, the resulting injury was caused by his own fault, and of necessity his estate must suffer this loss.

Labatt, in his work on Master and Servant, section 588, says: "One special application of the general conception underlying the rule stated in the preceding section is that, where the work is of such a character that as it progresses the environment of the servant must necessarily undergo frequent changes, the master is not bound to protect the servant engaged in it against the dangers resulting from those changes." In Durst v. Carnegie Steel Co., 173 Pa. 162, 33 Atl. 1102, it was held that where the place as it stands when the work begins is perfectly safe, and the danger can only arise as the work progresses, and be caused by the work done, it is not the duty of the employer to stand by during the progress of the work to see when a danger arises; that it is sufficient if he provides against such danger as may possibly or probably arise, and gives the workmen the means of protecting themselves. In Cleveland, C., C. & St. L. R. R. Co. v. Brown, 20 C. C. A. 147, 73 Fed. 970, it was held that the duty of a master to provide his servants a safe place in which to work does not attach where the place becomes dangerous in the progress of the work, either necessarily or from the manner in which the work is done. To the same effect is Baird v. Reilly, 35 C. C. A. 78, 92 Fed. 884; O'Connell v. Clark, 22

Smiths' Admr. v. North Jellico Coal Co.

App. Div. 466, 48 N. Y. Supp. 74. The evidence, as said before, showed that it was the duty of the decedent to call for props when he needed them, and that it appears the danger of the place where he was working was constantly changing and increasing as the work progressed, unless the roof was propped. It necessarily results that as he failed to take the ordinary precaution to prevent injury to himself he alone must bear the resulting injury

For these reasons, we are of opinion that the trial court correctly ruled in awarding the peremptory instruction to the jury to find for the defendant at the close of plaintiff's evidence.

Judgment affirmed.

JUDGE NUNN dissents.